199 So.2d 803 (1967)
Abraham REED
v.
STATE of Mississippi.
No. 44432.
Supreme Court of Mississippi.
June 12, 1967.
*804 R. Jess Brown, L. Lackey Rowe, Jr., Jackson, for appellant.
Joe T. Patterson, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., Jackson, for appellee.
ETHRIDGE, Chief Justice.
Abraham Reed, appellant, was convicted in the Mayor's Court of the Town of Fayette, Mississippi, on a charge of carrying a concealed weapon. He appealed, and on a trial de novo in the Circuit Court of Jefferson County, he was again convicted, from which this appeal was taken. The issues pertain to jury selection, and arrest and search of defendant's person. We affirm.

I.
Reed filed a motion to quash the jury venire on the ground of systematic exclusion of Negroes from the jury lists prepared by the county supervisors, and from the venire of the September 1966 term, and for other reasons to be later stated. The circuit court correctly overruled the motion.
The jury lists in the years 1956 through and including 1965, prepared by the Board of Supervisors of Jefferson County, did not include the name of any Negro. During the same period, 1956-65, no Negro was ever summoned on the venire for any term of court, and during the same period, no Negro ever sat on a jury in Jefferson County. During the same period, no woman ever sat on a jury in that county. The United States census of 1960 reflects that the number of white males, 21 or over, in Jefferson County was 803; the number of non-white males, 21 or over, was 1,620. The total male population, 21 or over, was 2,423 out of a total population of 10,142.
In April 1966, the board of supervisors prepared the jury list for that year. The trial was in September 1966. Appellant called the circuit clerk as a witness. He testified: There were about 250 names on the supervisors' jury list, and he estimated there were 95 Negroes, and the remainder were white. The venire for the September 1966 term contained 62 names, of which 26 were Negroes. The names of six Negroes were drawn for the grand jury venire. On jury number one for the first week of the term, there were four Negroes and six whites; on jury number two, eight Negroes and four whites; and on jury number three, six Negroes and six whites. The venire for the second week of the term contained the names of seventeen Negroes and nineteen whites. Thirty-four persons were served with process for the second week of the term; seventeen of them were Negroes. The total number of veniremen was drawn in proportion to the number of registered voters in each of the five supervisors' districts.
The circuit clerk received certified lists from the Federal Registrar of Voters, which contained approximately 800 Negroes, to be registered in his office. He added them to the registration books. There are approximately 4500 persons registered to vote in Jefferson County.
Appellant then called as witnesses the five members of the board of supervisors. At this point, the statutes are pertinent. Mississippi Code 1942 Annotated section 1766 (Supp. 1966), provides:
The board of supervisors at the April meeting in each year, or at a subsequent meeting if not done at the April meeting, shall select and make a list of persons to serve as jurors in the circuit court for *805 the twelve (12) months beginning more than thirty (30) days afterwards, and as a guide in making the list they shall use the registration book of voters and shall select and list the names of qualified persons of good intelligence, sound judgment, and fair character, and shall take them, as nearly as they conveniently can, from the several supervisors districts in proportion to the number of qualified persons in each, excluding all who have served on the regular panel within two (2) years, if there be not a deficiency of jurors. The clerk of the circuit court shall put the names from each supervisors district in a separate box or compartment, kept for the purpose, which shall be locked and kept closed and sealed, except when juries are drawn, when the names shall be drawn from each box in regular order until a sufficient number is drawn.
Mississippi Constitution section 264, as amended in 1960, states that the legislature shall provide for the qualifications of grand and petit jurors, and for procuring a list of persons so qualified and the drawing thereof for each term of circuit court.
Mississippi Code 1942 Annotated section 1762 (Supp. 1966) states particularly who are competent jurors. It states:
Every male citizen not under the age of twenty-one (21) years, who is either a qualified elector, or a resident freeholder of the county for more than one year, and has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five (5) years and who is not a common gambler or habitual drunkard, is a competent juror; but no person who is or has been within twelve (12) months the overseer of a public road or road contractor shall be competent to serve as a grand juror. But the lack of any such qualifications on the part of one or more jurors shall not vitiate an indictment or verdict. However, be it further provided that no talesman or tales juror shall be qualified who has served as such tales juror or talesman in the last preceding two (2) years; and no juror shall serve on any jury who has served as such for the last preceding two (2) years; and no juror shall serve who has a case of his own pending in that court, provided there are sufficient qualified jurors in the district, and for trial at that term.
The circuit court judge in his discretion may authorize resident freeholders to serve as jurors. Miss.Code 1942 Ann. §§ 1762-01, 1762-02 (Supp. 1966). Section 1762-03 provides how the lists of jurors are procured, stating that as a guide in making the lists they shall use the registration book of voters and the land assessment rolls of the county, "and shall select and list the names of qualified persons of good intelligence, sound judgment, and fair character * *"
One of the supervisors stated that he did not select people who were drunkards or gamblers, or who were sick. Another said that he eliminated people that were over the age of 65 years, who would be ineligible to serve as a juror if their age were claimed. Another supervisor said that he eliminated people who drank and "cut-up." Another testified that he tried to select good jurors. He had no objection to any of them on the list. A lady supervisor said that she chose the people that she thought would be good jurors.
Overruling the motion to quash the venire, the circuit judge found that the Supervisors of Jefferson County had made an honest effort to comply with state and federal law in selecting juries without discrimination as to race, and that they had done an honest and fair job. The list which was drawn for the September 1966 term showed no discrimination between the races.
The record affirmatively reflects that the supervisors were not guilty of any invidious discrimination as to race in their selection of the jury venire. Supervisors are laymen, not skilled in verbally duplicating the statutory criteria, but a fair reading *806 of their testimony shows that in substance they were following the statutes.
Moreover, the undisputed facts as to the racial constitution of the juries for the September term rebut any charge of systematic exclusion of Negroes. The presumption of discrimination which might arise from the practices of previous years was effectively and thoroughly rebutted. In short, the record does not show any such discriminatory exclusion in this case; the evidence is to the contrary. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469 (1953). The question of systematic exclusion poses a factual issue which must be determined by the particular facts of each case as they arise from the various counties of the state. Dunning v. State, 251 Miss. 766, 171 So.2d 315 (1965). The presumption of purposeful prior exclusion was overwhelmingly rebutted by witnesses offered by defendant on his motion to quash. He then had the burden of proof to show purposeful and systematic exclusion, and he failed to do this.
Appellant further contends that Code section 1766 is unconstitutional, because it provides for the selection of jurors on a basis of vague, subjective and nonreviewable standards, thus vesting unlimited discretion in the board of supervisors. This argument ignores the interrelationship of several pertinent statutes, which are in pari materia.
Code sections 1766 and 1762-03 require that jurors must be "qualified persons of good intelligence, sound judgment, and fair character * * *" They must also be read along with the above-quoted section 1762, which states that every male citizen, not under 21 years of age, who is a qualified elector and able to read and write, has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five years, and who is not a common gambler or habitual drunkard, is a competent juror. These related statutes are in pari materia. Many of their criteria are wholly objective in the definition of a competent juror. These standards modify and define the more general criteria of intelligence, judgment and character. Moreover, most of the states of the Union use in part a formula substantially similar to that of "good intelligence, sound judgment and fair character." Alabama Code, tit. 30, § 21 (1958); Ga. Code Ann. § 59-106 (1965); N.C. Gen. Stat. § 9-1 (1953); Texas Rev.Civ.Stat. art. 2133 (1964). Considered as a whole, the statutes providing for selection of jurors are not void for vagueness, but reasonably definite standards. See Miss.Code 1942 Ann. § 1798 (1956) (jury-laws directory only).
Code section 1762 excludes women from jury service. Appellant contends that this is an invalid discrimination. However, State v. Hall, 187 So.2d 861 (Miss. 1966), appeal dismissed for want of jurisdiction, 385 U.S. 98, 87 S.Ct. 331, 17 L.Ed.2d 196 (1966), decided this issue adversely to appellant's position. See Shinall v. State, 199 So.2d 251 (Miss. May 15, 1967).

II.
Appellant contends that the city marshal did not have authority to search his person, the search was not incident to a lawful arrest, there was no probable cause to arrest him at the time he was searched, and since the search was illegal, it violated appellant's rights under the state and federal constitutions, and the evidence was inadmissible.
By amended affidavit, Reed was charged with violating an ordinance of the Town of Fayette, which adopted the state penal statute prohibiting the carrying of a concealed deadly weapon. The affidavit sufficiently charged the elements of the offense. The statute is Code section 2079:
Any person who carries concealed, in whole or in part, any bowie-knife, dirk-knife, *807 butcher knife, pistol, brass or metallic knuckles, slungshot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor. Miss.Code 1942 Ann. § 2079 (1956).
The pistol which was taken from appellant was not loaded, but an unloaded pistol is within the statutory prohibition. State v. Bollis, 73 Miss. 57, 19 So. 99 (1895). Further, a person carrying a deadly weapon, only part of which is concealed, carries "a concealed weapon." Martin v. State, 93 Miss. 764, 47 So. 426 (1908).
Dumont Freeman was the day marshal in the Town of Fayette. He had known Reed for several years, and around eleven A.M., he testified that the following occurred:
A. Well, I saw Abraham come down the street and pass me and start on north and I noticed a rule in his pocket and evidently he had on a pair of khaki pants that had been worn for several days and I could very distinctly see the imprint of a gun, in his right hip pocket. I didn't stop him at that time. He went on to the post office and proceeded back by me. When he got next to my office I said, Abraham, step in here, I want to see you. * * *
A. The rule was a six foot rule, if I remember, one of the folding type rules. This rule had some way gotten over behind this gun and I could clearly see the imprint of the gun, I knew it was a gun.
In the absence of the jury, there was a hearing on defendant's objection. Freeman said that he "could see that he had a gun in his hip pocket," that "he knew he had a gun on his person." The "imprint of the gun was plain."
Q. Did you take a gun from his person when you arrested him?
A. I did.
The pants apparently had been worn several days, and the imprint of the gun was clear. Reed came by the marshal's office going to the post office. In about three minutes he returned, the marshal said, "I asked him to step into my office." Reed did so.
A. I said, Abe, what do you have in your pocket. He pulled out a rule. I said, Abe, you have a gun on you, and Abe held up his hands and I reached in his pocket and pulled it out. * * *
Q. And you did this on the basis of seeing an outline in his pocket?
A. I did this on the basis that I had seen a gun and recognized a gun in his pocket.
Q. Yes, but you testified, I believe, Mr. Freeman, that you saw an outline of the gun, you never testified that you saw the gun?
A. That's true, but I knew it was a gun.
Q. Yes, but you didn't actually see the gun?
A. Yes, you might say I did see the gun.
Q. Well, I understood your testimony to be that you saw an outline of a gun, outlined against 
A. Well, it was so perfect until I had no question in my mind.
On further cross-examination, the witness stated:
Q. Now, is it after you pulled out the gun, is that when you arrested him?
A. After I pulled the gun out I told him that he was under arrest for carrying a concealed weapon.
Q. So you didn't actually arrest him until you had the gun on the table?
A. That's right.
*808 However, Freeman further testified:
Q. To make it perfectly clear before the jury, I want you to describe and state to the jury again what you observed and what caused you to take the action you did in arresting this defendant?
A. Well, sir, I saw Abraham go down the street and I noticed very distinctly the rule and what I was fairly positive in my mind was a gun, in his right hip pocket. He had on a pair of khaki pants and evidently this gun had been in that pair of pants for several days. I let him proceed to the post office, I figured that's where he was going, I was acquainted with him, and he came back by and I stopped him. I did not say you are under arrest, but I considered he was under arrest when I stopped him.
BY MR. BERGESEN:
Objection.
BY THE COURT:
As to what he considered, sustained.
There had been picketing and boycotting of some stores in the town, and the marshal was looking out for any trouble which might arise.
Under these facts, the offense of carrying a concealed weapon was committed in the presence of the officer. The statute authorizes an officer to arrest a person without a warrant for his arrest where a misdemeanor is committed in his presence. Miss.Code 1942 Ann. § 2470 (1956). The officer had more than probable cause for the arrest. The misdemeanor was actually being committed in his presence. Where through the senses of sight, or smell, or hearing, the officer receives knowledge that an offense is being committed in his presence, he may arrest the offender without a warrant. Lewis v. State, 198 Miss. 767, 23 So.2d 401 (1945); Baldwin v. State, 175 Miss. 316, 167 So. 61 (1936).
In Daniels v. City of Gulfport, 146 Miss. 517, 112 So. 686 (1927), the officer threw his light upon a woman walking on the street at night and observed that she was carrying a pistol partially concealed. This was not unlawful search, and the officer had a right to seize the pistol and arrest the defendant. However, if an officer makes an arrest upon knowledge obtained through one of his senses that a crime is being committed in his presence, he acts at his peril. He is not the final judge of his acts. They are subject to examination by the court. 5 Am.Jur.2d Arrest § 32 (1962). In the instant case, the trial court was warranted in finding that the officer knew that appellant was committing the offense in his presence.
The remaining question is whether the timing of the arrest itself was such as to invalidate the product of the search. We do not think it was.
In Gearing v. State, 185 So.2d 652, 653 (Miss. 1966), this Court quoted with approval the statement in 54 Am.Jur.2d, Arrest section 1 (1962), in which it is said:
An arrest is the taking, seizing, or detaining of the person of another * * (2) by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested."
In Gearing it was further stated:
It is not necessary that formal or particular words be used, for the fact of arrest may be shown by surrounding facts and circumstances. 185 So.2d at 654.
*809 See 6 C.J.S. Arrest § 1b (1937). No formal words of arrest are required, "and it is sufficient if the facts and circumstances make his (the officer's) intention clear." 5 Am.Jur.2d Arrests § 70 (1962).
Here the actions and words of the city marshal, and the actions of Reed reflect that in fact he was arrested and detained before the marshal removed the pistol from his pocket. The officer "stopped" Reed, and said to him, "Step in here, I want to see you." In the office, after asking defendant what he had in his pocket, he pulled out a carpenter's rule. The marshal then stated that he had a gun on him, and defendant "held up his hands, and I reached in his pocket and pulled it out." Although on cross-examination he stated that he did not use the exact words of arrest until he took the pistol, in explanation on redirect, he said, "I stopped him. I did not say you are under arrest, but * *" Although the court excluded the clause, "but I considered he was under arrest when I stopped him," the intent of the officer and that statement by him are significant. "An arrest must have been performed with the intent to effect an arrest, and must have been so understood by the party arrested." 5 Am.Jur.2d, Arrest § 1 (1962).
Although no formal declaration of arrest is required, it is quite apparent that defendant understood he was being arrested. He raised his hands. Certainly there could be no stronger or more demonstrative evidence of defendant's knowledge that he was being arrested, than by him raising his hands. This is the traditional and symbolic gesture of acquiescence to an arrest.
In short, there was a proper arrest by acts which indicated and reflected an intention to take the defendant into custody, and which subjected him to the actual will of the person making the arrest. And further, when defendant raised his hands, he unequivocally recognized that he considered he was under arrest. This occurred before the officer removed the pistol from the defendant's pocket.
A case directly in point is Robinson v. Com. of Kentucky, 207 Ky. 53, 268 S.W. 840 (1925). A conviction for carrying a concealed deadly weapon was affirmed, where the defendant wore overalls and the officer could see the imprint of the pistol in his pocket "well enough to know that it was a pistol."
This decision is based on the foregoing considerations reflecting an arrest in fact before the search. However, if it is assumed that the search immediately preceded the arrest, another basis for upholding the search is that where the officer saw a misdemeanor being committed in his presence, he had probable cause for the arrest, and the arrest immediately followed the search and seizure of a concealed deadly weapon, the search is reasonable. United States v. Gorman, 355 F.2d 151 (2d Cir.1965); People v. Simon, 45 Cal.2d 645, 290 P.2d 531 (1955); State v. Hoover, 219 Or. 288, 347 P.2d 69 (1959); Annot., 89 A.L.R.2d 715, 780 (1963).
Affirmed.
GILLESPIE, P.J., and RODGERS, BRADY, SMITH and ROBERTSON, JJ., concur.
JONES, PATTERSON and INZER, JJ., dissent on the lawfulness of the search.