Charles Eugene Hammock appeals from his conviction of murder in the Circuit Court of Harrison County and the imposition upon him of a sentence to life imprisonment.
He assigns for reversal four alleged errors: (1) the admission of his confession; (2) the admission of certain photographs of the homicide victim; (3) the admission of references to his refusal to take a polygraph examination and (4) the refusal of the trial court to instruct the jury that, upon the evidence, it might find Hammock guilty of manslaughter.
Evidence at the trial established that in the early morning hours of August 14, 1977, Hammock's stepfather, one Williams, was found brutally slain in North Biloxi, death having resulted from several gunshot wounds. It was developed that these wounds had been caused by slugs fired from a shotgun at close range. Hammock was arrested for the crime.
 1. THE ADMISSION OF HAMMOCK'S CONFESSION.
Hammock made statements on August 17, 18 and 23, 1977 in which he denied having committed the crime. Each of these statements was preceded or accompanied by a written waiver of his Miranda
rights, signed by Hammock. In each of these he was informed that he had a right to remain silent, anything that he said might he used against him in court, he had a right to talk to a lawyer before being questioned and to have him present during questioning, that if he could not afford a lawyer and wanted one a lawyer would be appointed, that if he decided to answer questions without a lawyer present he would have the right to stop the questioning at any time until he had talked to a lawyer. The consent to speak signed by Hammock in each instance, was in these words "I have read this statement of my rights and it has been read to me, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."
On August 24, 1977, Hammock signed a printed form in which this statement appears. "I do not have sufficient funds to employ an attorney. I therefore request that the court appoint an attorney for the purpose of representing me in connection with the charge of murder." The blanks provided for inserting the name of the court, the county and the judicial district were left blank. In Hammock's brief, it is stated that this petition was "filed" on August 24, 1977. However, the xerox copy appearing in the record, which includes the order granting the petition signed by the trial judge, reflects August 29, 1977, as the date it was filed with the clerk and is the only filing date appearing on the document. It is stated in Hammock's brief that the petition was signed by Hammock before a notary public "who was an employee in the sheriff's office." There is no evidence in the record that this paper was filed with *Page 325 
the clerk of the court on August 24, 1977, the day of its date, and it is conceded that it was not brought to the attention of the trial court in any way until August 29, 1977, three days after Hammock had signed a full confession.
This confession, signed on August 26, 1977, with a waiver of rights, (at one point Hammock said he knew them "almost by heart") consisted of twelve single-spaced typewritten pages, a xerox copy of which appears in the record. Also filed with, and made a part of the record, is the tape recording of the confession as given by Hammock.
A pretrial evidentiary hearing was conducted for the purpose of determining whether the confession had been freely and voluntarily given, at which the court heard the testimony of all of the officers who had been present to the effect that the statement had been freely and voluntarily given by Hammock, and had not been the product of any improper inducement and no promises or threats had been made and no pressure or coercion of any kind had been used. Hammock did not testify at the hearing and the officer's testimony was not rebutted. On the evidence adduced, the trial court ruled that the confession had been free and voluntary and that it was admissible in evidence.
At the trial, the statement was admitted in evidence as part of the State's case. After the State had rested, Hammock took the stand as a witness in his own behalf.
The direct examination of Hammock by his counsel opened with Hammock's statement that he had just been released from the penitentiary where he had served five years for robbery. He stated that his mother had asked him to kill Williams, his stepfather, and that he had declined to do so. He admitted that he had accompanied his mother to purchase the shotgun shells about which testimony had been given and said that these shells had been bought for protection.
Asked by his counsel:
 Q. Okay. After you were arrested, you subsequently made the four statements introduced here today; is that not correct?
 A. It is.
 Q. Okay. I believe the, uh, you only signed the fourth statement (which was the inculpatory statement); is that correct?
 A. That's correct.
 Q. Okay. Would we be correct in saying you did not confess to the commission of this crime in the first three statements.
 . . . . .
 A. They was (sic).
 . . . . .
 Q. Okay. When you made the fourth statement, would you please tell the Court the reason for changing your story and, uh, signing that fourth statement, the one dated August 26? (the confession)
 A. Well, the first three was just kind of like a, uh, like a game like, uh, and then, uh, the fourth one, I just had to come on out and tell the truth about it.
In attempting to clarify this statement, under questioning of his counsel, Hammock said that only parts of the inculpatory statement had been true. Under subsequent questioning by his counsel and also by counsel for the State it developed from Hammock's testimony that most of the significant statements contained in the confession were true except for the ultimate fact that he had killed his stepfather. This part of the statement, he said, was false and had been made in order to protect the interests of his mother in her prosecution for her alleged part in the murder and to prevent his wife from being prosecuted as an accessory. Hammock freely admitted making the statement but seemed to indicate that he was "playing a game" with the officers and also that he had been induced to make it by promises by the officers of prosecutorial favors to his mother and wife. Hammock testified:
 A. All right. Regarding to anything in here, uh, what I am saying, the statement *Page 326 
itself is true, but anything to my, uh, to me killing him is not true.
 Q. Everything in this statement is true?
 A. Except the part about me killing him.
 Q. Except the part about you killing him?
 A. Right.
 Q. And you say it's not true, but you described it in very vivid detail?
 A. I did.
 Q. Didn't you?
 A. I did.
 Q. And you had gotten a gun from Randy for protection?
 A. I bought a gun from Randy. Yes, sir.
 Q. You bought it or you traded for it?
 A. Traded.
 Q. For protection?
 A. I did.
 Q. And you went and bought two boxes of shotgun shells?
 A. I didn't. My mother did.
 Q. Well, you went with her and charged it on her account, didn't you?
 A. Yes, sir.
The tape recording of Hammock's confession is before this Court on appeal, and supports the testimony of the officers. Hammock talked to them freely, at great length and in very considerable detail. He admitted his participation in the disposal of the gun but insisted at trial that he had nothing to do with killing Williams.
When the defense had rested, in rebuttal, the State recalled the three officers who had participated in the taking of Hammock's statements, including the inculpatory statement, and each of these officers rebutted the testimony that Hammock had given to the effect that he had made the statement to protect his wife from threats of prosecution and because of promises made that it would help his mother in connection with her prosecution as an accessory.
At the conclusion of the State's case there was an oral motion for a directed verdict, no grounds stated, which was denied. There was no motion to exclude the inculpatory statement which had been previously admitted in evidence on the basis of the testimony at the suppression hearing.
Following his conviction, a motion for a new trial was made in Hammock's behalf, assigning several grounds, but nothing relating to Hammock's statement was among them.
We have examined all of the testimony relating to the confession, including that of the witnesses at the suppression hearing, the inculpatory statement itself, given by Hammock, and the testimony of Hammock given as a witness in his own behalf at his trial, including his admission that he made the statement and his acknowledgment of the truth of a great part of the statement, as well as the rebuttal testimony of the officers, we have listened to the tape recording, and have concluded that the ruling of the trial court that the statement had been freely and voluntarily given was amply supported by the evidence and that he correctly ruled that it was admissible.
Nor is this altered by the "Request for Appointment of Counsel." The printed form signed by Hammock requesting appointment of counsel, notwithstanding that it was sworn to before a notary public "who was an employee in the sheriff's office," even if it could be assumed without support in the record, that it was filed with the trial court clerk on August 24, 1977, it is undisputed that it was not brought to the attention of the trial judge, or even marked filed by the clerk, until August 29, 1977, three days after Hammock had given his statement. We cannot assume a filing date earlier than that shown by the clerk's stamp, nor assume that the trial judge had knowledge of this petition prior to August 29, 1977, the date on which he granted it, as there is nothing in the record to so indicate and no contention that he did.
Hammock's admissions as a witness, the testimony of the officers as well as the tape recording, all combine to convince us that Hammock's statement was freely and voluntarily given with a full understanding of *Page 327 
his rights. Moreover, in its description of the circumstances of the killing it corresponds in detail with the undisputed physical facts of the case.
Hammock showed himself to be an intelligent person and seemed to take keen pleasure in sparring with prosecuting counsel. He was repeatedly informed of his rights (although he knew them "almost by heart") and repeatedly waived his right to have counsel present.
No evidence whatever challenging the voluntariness of the confession was adduced on the motion to suppress, or at all until after the confession had been introduced and the State had concluded its case and rested. It was not until the presentation of Hammock's defense on the merits, that Hammock, called as a witness in his own behalf, testified to alleged facts now said to have rendered the confession involuntary. At that stage, the trial court had correctly permitted the introduction of the confession in the State's case in chief and it was properly in evidence. Hammock, as a witness, freely admitted giving the statement and admitted that in large part the facts stated in it were true, challenging only the truth of the ultimate fact that it had been he who had shot Williams. His possession of the gun, the purchase of the shells, the disposition of the gun after the killing, the request by his mother to kill Williams, were among those facts admitted by Hammock from the witness stand. In this situation, in order to preserve the question on appeal, it was necessary to move to exclude the statement if it should then be considered that Hammock's belated testimony had shown it not to have been voluntary. No such motion was made. Moreover, Hammock's testimony as to its voluntariness was rebutted by the testimony of all three of the officers who were present when it was given and who were recalled for that purpose.
We hold that there was ample evidence supporting the trial court's finding that Hammock's confession had been freely and voluntarily given to fulfill the requirements and to meet the standards established and laid down in the following cases:Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Jordan v. State, 365 So.2d 1198 (Miss. 1978); Brewerv. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977);Agee v. State, 185 So.2d 671 (Miss. 1966).
We find no merit in the contention that the trial judge committed error in admitting Hammock's confession into evidence.
 2. THE ADMISSION OF PHOTOGRAPHS OF THE VICTIM'S BODY.
At the trial, certain photographs of the victim's body, showing its condition and location and the wounds which had been inflicted upon it, were admitted into evidence. There was no objection to the admission of the first of these photographs. Objection was made to the introduction of the others and it is argued on appeal that their purpose and effect were to inflame and prejudice the jury and that they were without evidentiary value. The competency, relevancy and materiality of photographs in homicide cases ordinarily are matters to be determined by the trial court within his judicial discretion. In the case before us, the photographs supplied some corroboration of the facts and circumstances related by Hammock in his account of the slaying contained in his confession. They also served the purpose of confirming the identity of the victim and identifying the place where the body was found as the place where Hammock said he had left it after the killing. We are unable to say that the pictures served no substantial or legitimate evidentiary purpose or that they were so inflammatory that their prejudicial effect outweighed their value as evidence. We find no error in the admission of the photographs. Voyles v. State, 362 So.2d 1236
(Miss. 1978); Irving v. State, 228 So.2d 266 (Miss. 1969).
 3. REFERENCE TO REFUSAL OF HAMMOCK TO SUBMIT TO POLYGRAPH EXAMINATION.
The fact that several references were made in the course of the trial to Hammock's refusal to submit to a polygraph *Page 328 
examination is now assigned as error, requiring reversal. An examination of the record, however, shows that such references were in response to questions by defense counsel as well as by prosecuting counsel. Moreover, in no instance was there any objection whatever to such questions or testimony elicited in response thereto. Neither the taking of a polygraph examination nor its result is admissible in evidence, but there was no such examination in this case, and no objection having been interposed at the trial, an objection to these questions and answers may not be raised on appeal for the first time. Martin v. State,354 So.2d 1114 (Miss. 1978); Williamson v. State, 330 So.2d 272
(Miss. 1976).
We find no prejudicial error as to the result of the references to a proposed polygraph examination.
4. REFUSAL OF TRIAL COURT TO INSTRUCT THE JURY IT MIGHT FIND HAMMOCK GUILTY OF MANSLAUGHTER.
The trial court declined to grant an instruction informing the jury that, if it found that the defendant had committed the homicide, it might find him guilty of manslaughter rather than of murder.
Manslaughter has been defined as the killing of a human being in the heat of passion by use of a dangerous weapon without authority of law and not in necessary self-defense. Jones v.State, 58 So.2d 655 (Miss. 1952). The distinction between murder and manslaughter is that the homicide in the case of murder must have been committed with malice and after deliberation. Goldsbyv. State, 226 Miss. 1, 78 So.2d 762 (1955), certiorari denied,350 U.S. 925, 76 S.Ct. 216, 100 L.Ed. 809.
Ed Rehak, M.D., performed an autopsy on the body of Williams. Death occurred on August 13, 1977, and there were three gunshot wounds on the body although it could not be determined with any certainty which wounds were entry wounds and which were exit. It was the doctor's opinion that Williams had been shot twice, once in the front and once in the back.
In his confession, Hammock related how, pursuant to a preconceived purpose, he lured Williams to a lonely spot, induced him to get out of the automobile for the purpose of killing him and how he then shot him as he lay on the ground, returning to "make sure" that Williams was dead by shooting him again.
In addition to Hammock's confession, one Randy Waldrop, a convicted burglar, testified as a witness for the State. He said that two weeks prior to the murder he had delivered to Charles Hammock a sixteen gauge shotgun in exchange for an automobile tape player. Waldrop and Hammock visited each other from time to time and on August 14, 1977, Hammock told Waldrop that he had killed Williams, his stepfather, with the shotgun and asked Waldrop to dispose of the weapon. Waldrop said that, using a hacksaw provided by Hammock's mother, he destroyed the gun and took the pieces to her house where they were hidden in the washing machine. Waldrop testified that he reported these facts to the sheriff at Wiggins.
The record in this case contains no evidence capable of supporting a conviction of manslaughter. Hammock's defense is that he did not commit the homicide. His confession shows both deliberation and malice. Hammock was guilty of murder or nothing. The trial court did not err in refusing to instruct the jury that it might find Hammock guilty of manslaughter as there was no evidence capable of supporting such a finding. Presley v.State, 321 So.2d 309 (Miss. 1975). In order to justify the giving of a manslaughter instruction in a homicide case there must be competent evidence tending to show that the killing was in the heat of passion and without deliberation or malice.Newell v. State, 209 Miss. 653, 48 So.2d 332 (1950); Caldwellv. State, 347 So.2d 1389 (Miss. 1977); Ruffin v. State,227 Miss. 204, 85 So.2d 821 (1956).
No prejudicial error having been shown to have occurred in the trial of Hammock, and the evidence fully supporting the verdict of guilty returned by the jury, the *Page 329 
conviction and sentence appealed from must be, and are, affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.