381 So.2d 173 (1980)
Alvin CESSNA
v.
STATE of Mississippi.
No. 51730.
Supreme Court of Mississippi.
March 12, 1980.
Mark W. Prewitt, Everette Verhine, Vicksburg, for appellant.
A.F. Summer, Atty. Gen. by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and WALKER and LEE, JJ.
ROBERTSON, Presiding Justice, for the Court:
Alvin Cessna was indicted, tried and convicted in the Circuit Court of Warren County of the murder of Phillip Morson on September 21, 1977. He was sentenced to life imprisonment in the Mississippi State Penitentiary. Cessna assigns as error:
I. The verdict is against the overwhelming weight of the evidence.
II. The court erred in not allowing lay witnesses to testify as to their opinion of the appellant's sanity.
III. The court erred in admitting photos of the deceased when commission of the homicide was not contested.
Cessna, at the time of the shooting of Phillip Morson was 29 years of age, had been drafted into the regular army when he was 19, had seen considerable combat duty in Vietnam and had served in the army for a total of four years.
Since his return home to Pattison, Mississippi, he had tried a number of jobs but, because he could not get along with his fellow employees or his employers, he would *174 either quit or be fired after working a short time.
Cessna's mother, father and younger sister testified that they noticed a definite change in him when he returned home from the army. He was irritable, depressed, would become angry easily, would appear spaced out at times and would just sit and stare at the wall. He threatened to kill his mother and father on one occasion, and then at another time threatened to kill his brother. Finally he threatened his younger sister with a pair of scissors. After this incident, he agreed to go to Mississippi State Hospital at Whitfield for treatment. He was admitted on September 17, 1975, and on October 27, 1975, the staff psychiatrist at Whitfield, Dr. Robinson, submitted his diagnostic summary, which closed with these words and this diagnosis:
"In summary, this is a 27 year old white male who comes in with delusions, hallucinations, unusual behavior, and threats of violence prior to coming into the hospital. Has been treated with ten electroshock treatments, is now on phenothiazine medication, and is felt that he is chronically ill.
DETERMINED DIAGNOSIS: SCHIZOPHRENIA, PARANOID TYPE."
On November 12, 1975, Cessna was transferred to the Veterans Administration hospital in Gulfport, Mississippi, where he remained for about a year. He was on prescribed medication when he was discharged from the Veterans Administration hospital. He returned to the V.A. Hospital a number of times for further treatment.
In August, 1977, Cessna got a desk job at Presley's Truck Stop in Vicksburg. His job was to write up charge tickets, receive cash, and make change from the cash register. He sat at a long counter in the truck stop office where customers came to pay their bills and to purchase accessories displayed there.
Cessna testified that before the shooting on September 21, 1977, he had not had much to do with Phillip Morson, who mainly worked outside waiting on gas customers and servicing trucks, but that Morson, who had worked at the truck stop for about a month, had on occasion irritated and nagged him.
On the morning of September 21st, Cessna had brought a 357 Magnum pistol with him. When he arrived at work he took the pistol out of his belt and put it in his green field jacket, folded his jacket, and put it in a chair at one end of the counter. About 9:30 A.M., 19-year-old Phillip Morson was inside the office on the customer side of the counter, talking to a customer, Ray McCoy. Cessna told Morson: "It's time for you to get back to work," and Morson's reply was: "You're not my boss, Mr. Presley is." Cessna immediately got up, walked to the far end of the counter, reached into his field jacket and pulled out the 357 Magnum. He walked back up toward Morson, raised the pistol, pulled the hammer back and said: "I tell you it's getting time to get back to work." Morson was about to turn around when Cessna shot him once in the head, the bullet entering just above the left ear and exiting above and toward the front of his right ear, killing him instantly.
Mr. Gene Presley came out of his office and asked: "Alvin, what the hell did you do?" and after Presley repeated his question, Cessna answered: "I blew Phillip's head off just like I said I would." Presley than saw Morson's body for the first time and asked Cessna to give him the gun. Cessna turned toward Presley and when Presley again asked for the gun, Cessna replied "No, I'll keep the gun, you call the police."
The shooting of Morson by Cessna is not disputed. The appellant's sanity at the time of the shooting is the only issue. The appellant argues that the evidence overwhelmingly established his lack of criminal responsibility because of insanity. The state responds that no doubt of sanity was raised but, assuming it was, the state's rebuttal evidence removed any doubt.
In addition to the testimony of appellant's family members and the documentary evidence (Whitfield's medical records), appellant put on Dr. Samuel Feurst, a *175 Vicksburg psychiatrist. Dr. Feurst was asked a lengthy hypothetical question and answered that in his opinion the appellant was psychotic or insane, suffering from schizophrenia of the paranoid type, and that he did not know the difference between right and wrong when he shot Morson. He had never examined Cessna and his opinion was based only on the hypothetical questions asked.
To rebut any evidence of the appellant's insanity, Dr. Donald Guild, Psychiatrist in charge of the Forensic section at Whitfield, testified that in his opinion Cessna was sane at the time of the shooting and that Whitfield's Board of Psychiatrists had reached the unanimous conclusion that Cessna was without psychosis and competent to stand trial, he having been sent to Whitfield on June 13, 1978, for an examination and evaluation of his sanity and his competency to stand trial. Dr. Guild explained the guidelines they use at Whitfield and his conclusions in this way:
"Q You are familiar with the legal term of M'Naghten and the definition?
A Well, I can tell you what we operate at the State Hospital. We operate at the State Hospital with guide lines that we have taken from the case law and that is M'Naghten. Does a person know the nature and quality of his act and if he knows the nature and quality does he know the difference in right and wrong. If the answer to either of those questions is no, he would be M'Naghten insane.
Q Yes sir.
A There is also another little thing and if he was suffering under a delusion, the logical resolution of which is legal, then he is also M'Naghten insane. Those are the three criteria that we use. We split hairs a little bit.
Q That is the legal definition of insanity insofar as the responsibility for a crime, in your opinion, is concerned?
A Correct. I think I've been over it a number of times and that's what I 
Q I'll ask you then to state to this Court and jury what conclusion you reached as to the defendant, Alvin Cessna, in regard to his ability to know and appreciate the nature and consequences of his acts and his ability to distinguish between right and wrong?
A It's my opinion that he knew the nature and quality of his act. That is, more specifically, that he had a pistol, that a pistol was a deadly weapon and that it would inflict serious bodily injury or death. I think that he knew that. I think that he appreciated the wrongfulness of that act and could appreciate that and I also find no evidence of delusion, the logical resolution of which would have been illegal despite the case history of illness."
This Court recently reaffirmed its adherence to the M'Naghten rule in Hill v. State, 339 So.2d 1382 (Miss. 1976).
In our opinion, the state produced sufficient evidence to rebut any doubt of sanity raised by the appellant.
The second assignment of error has to do with the trial court's refusal to allow Ben Cessna, appellant's father, Doris Cessna, his mother, and Patsy Cessna, his sister, to give their opinion of Cessna's sanity at the time of the shooting. All of these family members had been allowed to testify in great detail of appellant's, at times, odd, unusual, violent and bizarre behavior, his periods of depression and his spaced out appearance, but when asked for their opinion the trial court would sustain the objection of the state.
It was stipulated that if Mrs. Cessna had been allowed to give her opinion she would have stated that "he was insane."
On cross-examination of Ben Cessna, he answered once: "He was mentally unbalanced" and again: "He is mentally disturbed."
We feel that the jury had the benefit of all of the family members' testimony as to *176 all instances of appellant's unusual behavior, and, while they should have been allowed to give their opinion based on their personal observations, we do not feel that the court's refusal to allow this constituted reversible error.
The third assignment of error is that the court erred in admitting one color photograph of the deceased and two color pictures of the pool of blood in the office of the truck stop where deceased was shot, when there was no issue as to appellant having committed the homicide.
This Court has examined the three photographs in question and, while they are rather gruesome pictures, we feel that they do have some probative value in showing the interior of the service station and the layout at the scene of the shooting. The picture of the victim does show his location in the office and where he was shot in the back of his head before he had a chance to turn around.
We have held many times that it is largely within the discretion of the trial court as to whether gruesome pictures have any probative value and whether they should be admitted. See Butler v. State, 320 So.2d 786 (Miss. 1975). We cannot say that the trial court abused its discretion in admitting these three color pictures.
There being no reversible error, the conviction and sentence are affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.