473 So.2d 180 (1985)
Darryl J. SWANIER
v.
STATE of Mississippi.
No. 55588.
Supreme Court of Mississippi.
July 17, 1985.
Rehearing Denied August 7, 1985.
*181 Jimmy D. McGuire, Herman F. Cox, Gulfport, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, DAN M. LEE and ROBERTSON, JJ.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of Harrison County wherein the appellant, Darryl J. Swanier, was tried and found guilty of the capital murder of Johnny Mickel, a convenience store clerk in Pass Christian, Mississippi. The jury was unable to agree on a punishment for Swanier and the trial court thereafter sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. From his conviction and sentence Swanier brings this appeal and assigns as error:
I. The Court erred when, over the defendant's objection, it allowed into evidence State's Exhibit No. 2 which consisted of a photograph of the deceased lying on his back, which disclosed gruesome aspects of the crime which were not pertinent, relevant, competent, or material on any issue in this case, and *182 was offered by the prosecution into evidence solely for the purpose of influencing and inflaming the minds of the jurors against this defendant, and furthermore that said exhibit had no probative value in view of the fact that State's Exhibit No. 1 fairly and accurately depicted the condition of the deceased on the date of the alleged murder and the location of the deceased where he was found on the date of the alleged murder, and furthermore that State's Exhibit No. 2 reflected that the deceased was wearing a deputy sheriff's badge around his belt and that said matters unduly biased and prejudiced the jury against the appellant.
2. The Court erred in failing to sustain the Defendant's Motion to Suppress the statement of the Defendant when the Defendant was arrested without probable cause and was not advised of the object and cause of his arrest and when his statement was obtained under conditions which were violative of the Defendant's constitutional rights as per the Miranda Decision and due to the fact that the Defendant did not knowingly and intelligently waive his Miranda Rights before making the subject statement, and due to the fact that the interrogating officer failed to make any tests to determine if the Defendant understood his Miranda Rights and did, in fact, knowingly and intelligently waive same.
3. The Court erred in granting Instruction No. C.00 and the Court further erred in refusing to grant Jury Instruction D-12.
4. The Court erred in granting Instruction No. S-1.

I.
In the early morning hours of March 13, 1982, Pass Christian Policeman Archie Seller responded to a report of a disturbance at a local convenience food store. When he arrived on the scene Patrolman Seller found Johnny Mickel, the night clerk at the Junior Food Store, lying in a pool of blood in the store's parking lot. Mickel had been stabbed to death.
Mariann Stansbury, the manager of the Junior Food Store, testified that she had placed a $2.00 bill in the cash register under the stack of $1.00 bills. The $2.00 bill's serial number had been recorded in the back of the store. This was done in order to assist the police in apprehending anyone who might rob the store. She identified a $2.00 bill presented to her by the prosecution as the one whose serial number she had recorded. Ms. Stansbury testified that approximately $140 was missing from the store's cash register and safe following Mickel's murder.
Ruth McRee testified that she worked the shift immediately before Mickel. She had seen the $2.00 bill in the cash register drawer before leaving work.
On June 16, 1982, Ruth McRee was working in the store when a man she identified as Swanier came in the store and purchased some items with the $2.00 bill. McRee's husband, Reed McRee, also happened to be in the store at that time and he corroborated the identification of Swanier as the one who passed the $2.00 bill.
Lynda Bates, a security officer for the Junior Food Stores, testified that she arrived at the Junior Food Store on March 16, just as Swanier was walking out the door. The McRee's alerted her that Swanier had passed the stolen $2.00 bill to them. Bates then telephoned the Pass Christian Police Department and gave them a description of Swanier.
Jackie Griffin testified that she worked as a store clerk for the Li'l General Store in Pass Christian. At approximately 2:40 to 2:50 in the morning of March 17, 1982, Swanier came into her store and purchased some ice cream and potato chips. Because she had been alerted by the police to watch for someone of Swanier's description, Ms. Griffin called the police as soon as Swanier left.
Officer Judy Murphy Newnum of the Pass Christian Police Department testified that she received word that the suspect in the Mickel killing had just been seen in the Li'l General Store. Moments later she began *183 driving around that neighborhood in search of him. Shortly thereafter Officer Newnum saw Swanier riding a bicycle and eating ice cream a few blocks from the Li'l General. Officer Newnum pulled Swanier over and asked him to wait for Pass Christian Police Department Investigator John Dubuisson. Officer Newnum told Swanier that they needed to talk to him about a murder. Officer Newnum gave other testimony which was consistent with her testimony at a pretrial suppression hearing which is detailed below. The state also produced the testimony of Officer John Dubuisson who testified just as he had at the pretrial suppression hearing, and that testimony is detailed below. During Officer Dubuisson's testimony a statement given to the police by Swanier, in which Swanier admitted killing Mickel, was admitted into evidence.
The defense called Sylvester Alexander, Swanier's grandfather, and Melvin Swanier, Swanier's father, to testify in his behalf. Their testimony was identical to their testimony at the pretrial suppression hearing and is detailed below.
Darryl Swanier testified in his own defense. Swanier stated that two anonymous black males were responsible for the murder of Mickel. He stated that he was in the store at the time to purchase beer and candy. As he was getting his beer and candy he turned around and saw a fat black man and a skinny black man robbing Mickel. According to Swanier, by the time he noticed the robbery occurring, Mickel had already been stabbed. Mickel then ran out the door of the convenience store and one of the two assailants asked the other, "What are we going to do with him?" referring to Swanier. According to Swanier, they gave him some money and told him to keep his mouth shut or they would kill him. The two assailants then left the store, got in a green car and left. Swanier stated that he then left the Li'l General because he was on probation from an offense which occurred in New Jersey and he did not think anyone would believe his story. Swanier thought that Mickel was not hurt very badly and would be able to identify his assailants. The next day, after Swanier learned of Mickel's death, he did not report his knowledge of the incident to anyone because he was afraid he would not be believed.
On this evidence and other testimony, consistent with the testimony at the pretrial suppression hearing, Swanier was found guilty.

THE SUPPRESSION HEARING
At a pretrial hearing on Swanier's motion to suppress his confession, Officer Newnum testified that she had stopped Swanier because he matched a description of a person who had passed the $2.00 bill known to have been stolen from the Junior Food Mart. About a minute after she stopped him, Officer Dubuisson arrived. Officer Dubuisson asked Swanier if he would accompany them to the police station and Swanier said, "Yes." Swanier rode with Dubuisson and another officer took Swanier's bicycle in a police vehicle to the police department. Officer Newnum testified that Swanier was read his rights after they arrived at the station. She stated that she was present when his rights were read and when a consent to speak form was given to Swanier. Newnum stated that Investigator Dubuisson read the rights warning and consent to speak to Swanier and then Swanier read the form for himself and signed it. Newnum denied that any threats, force, promises or duress were used to get Swanier to speak or sign the form. Swanier's rights were read to him at 2:55 a.m., March 17. The officer initially attempted to get Swanier to explain how he came into possession of the $2.00 bill. Newnum testified that Swanier gave several different stories about how the bill came into his possession. First, he stated that he got it as change when he purchased some marijuana. Next, he stated that he had borrowed the $2.00 bill at a party. Swanier then asked to speak to a priest and his grandfather, Sylvester Alexander, a captain with the Harrison County Sheriff's Department. Both the priest and Captain *184 Alexander were called and both came to the Pass Christian Police Department immediately. Officer Newnum testified that during the interview with Swanier he asked if he was under arrest and Investigator Dubuisson told him, "No." According to Newnum, Swanier was free to leave.
Investigator Dubuisson testified that he read Swanier his rights at the police station when they arrived there. At 2:55 a.m. Swanier signed a waiver of his rights. At 5:30 a.m. the officers began taking a recorded statement from Swanier. During the time between the signing of the waiver and the statement the officers and Swanier discussed where Swanier had acquired the $2.00 bill. Dubuisson testified that at that point Swanier was not under arrest and was free to go. According to him, Swanier was not arrested until approximately 5:45 that morning, after he had given a statement confessing to the murder of Mickel. In between signing the waiver and making the statement, Swanier had requested to speak to his grandfather and a priest. He was allowed to do both prior to giving the statement.
Dubuisson testified that Swanier's grandfather, Captain Alexander, came to the Pass Christian Police Department to talk with Swanier. Swanier told Captain Alexander and Dubuisson the story about the two black males robbing the store. Both Alexander and Dubuisson told Swanier that his story was a little thin and that they didn't believe it. Swanier was given approximately 30 to 45 minutes alone with his grandfather. He was also given time alone with a priest. Swanier's father came to the police station and was present during Swanier's statement but did not speak with him.
Investigator Dubuisson testified that prior to the time Swanier signed the waiver of rights he was asked if he understood those rights and he replied, "Yes." Swanier was asked if he desired an attorney and he did not. According to Dubuisson at the time Swanier signed the waiver of rights there was no evidence of any alcohol on his breath nor did he appear to be intoxicated. Dubuisson had seen Swanier earlier that evening, at approximately 8:20, and Swanier had not been drinking then. Dubuisson denied that any threats, force, duress, promises or inducements were used to obtain this statement.
Captain Sylvester Alexander of the Harrison County Sheriff's Department, and Swanier's grandfather, testified that he received a call that his grandson was in the Pass Christian Police Station and desired to speak to him. Captain Alexander testified that he arrived at the station at approximately 3:00 a.m. (This is somewhat contradictory to Investigator Dubuisson's testimony that Captain Alexander arrived there at 4:00 to 4:15 a.m.) Captain Alexander testified that his grandson seemed like he had been drinking and was somewhat groggy and sleepy. He also stated that he tried to get Swanier to talk to him and that Swanier just sat with his head in his hands. Although Captain Alexander thought Swanier appeared to have been drinking, he was of the opinion that Swanier knew what he was talking about. Captain Alexander did not advise Swanier of his right to remain silent. Captain Alexander stated that midway through the statement Swanier had fallen asleep.
Although Swanier was reluctant to talk, Captain Alexander told him that he did not believe the story about the two black male assailants and Swanier then confessed to him. Captain Alexander testified that after that he left the room a priest went in to talk with Swanier for a few minutes. Subsequently Dubuisson, Alexander and Swanier's father went back into the room and took Swanier's statement. Alexander testified that he believed that Swanier understood all of Dubuisson's questions. Swanier started to cry when his father came in. He calmed down when Alexander told him that he would help him as much as he could. Thereafter, Swanier gave the statement.
Melvin Swanier, the appellant's father, testified that he arrived at the police station at 5:00 a.m. When he came in, Darryl Swanier looked up at him and began crying. *185 Mr. Swanier stated that his son looked like he was sleepy and had been drinking.
Darryl Swanier testified that all night of the evening of the 16th he had smoked hashish and drank scotch and beer. He stated that he had consummed two six packs and two quarts of beer in addition to four or five scotch and milks. When Officer Newnum stopped him she told him Dubuisson wanted to speak with him. Swanier testified that Dubuisson told him that he wanted to talk to him about a murder case. Swanier stated no one told him his rights prior to getting to the police station. He stated that immediately before being picked up he had finished smoking two joints of marijuana and drinking a quart of beer.
Swanier stated that Dubuisson told him that he was not under arrest but that he was not free to go. Swanier denied asking for his grandfather. He stated that he fell asleep and when he woke up his grandfather was there. Swanier stated that he did not recall signing a waiver of his rights and he knew he had not read the entire waiver. He stated that he gave the statement confessing to the murder just so that he could leave because he was tired. He also asserted that he was too tired to understand all that was going on.
Swanier admitted that no one threatened or promised him anything in exchange for the statement. He stated that he had told Dubuisson that he was not paying any attention to his rights as Dubuisson read them. Swanier testified that he knew the police were questioning him about the murder.
In rebuttal, the state called Officer Richard Winnegar of the Long Beach Police Department who testified that he was at the Pass Christian Police Department the evening Swanier was brought in. According to Winnegar, Swanier did not look drunk. Investigator Dubuisson then retook the stand and stated that Swanier was sober during the questioning and he had not fallen asleep.

THE ADMISSIBILITY OF STATE'S EXHIBIT NO. 2, A PHOTOGRAPH OF THE DECEASED.
Swanier objected to the admission of State's Exhibit No. 2, a photograph which depicts Mickel lying in the parking lot where he was found. Swanier argues that the photograph was more prejudicial than probative and its only purpose was to inflame the minds of the jurors. He also objected to it on the ground that the picture depicts what he asserts was a deputy sheriff's badge on Mickel's belt.
The first photograph introduced by the state was not objected to. It depicts Mickel lying face down in the Junior Food Mart parking lot in a pool of blood. Exhibit No. 2, which is the subject of this assignment of error shows Mickel after he was turned over on his back by law enforcement officers. Admittedly, it is a more gruesome photograph; however, it is probative of the severity of Mickel's wounds and is clearer than the first photograph. This Court has repeatedly held that photographs, although gruesome, are properly admissible where they do have some probative value. Roberts v. State, 458 So.2d 719 (Miss. 1984); Cessna v. State, 381 So.2d 173 (Miss. 1980); Hammock v. State, 379 So.2d 323 (Miss. 1980). Having carefully weighed the probative value of this photograph against its possible prejudicial effect we are of the opinion that there was no error committed in admitting it.
As to Swanier's allegation that the photo was inadmissible because it depicted Mickel's deputy sheriff's badge on his belt, we cannot agree. Although it is obvious from the photograph that there is something attached to Mickel's belt, it is in no way obvious that that something is a deputy sheriff's badge. In fact, the badge, if any, portion of the clip faces Mickel's body. Other than the comments by Swanier's attorney in objecting to the photograph, there is nowhere in the record any mention that Mickel was a deputy sheriff. The fact that the item clipped on his belt was a deputy sheriff's badge was never brought up before the jury. In overruling Swanier's *186 objection to the photograph, the trial judge stated: "I can't see that that's a deputy sheriff's badge," to which the defense attorney replied, "That's what it is, your Honor." The court then stated: "I don't think so, I sure can't tell that." Review of the photograph by the members of this Court makes it clear that the clipped on object could not readily be identified as a deputy sheriff's badge. Therefore, there is no merit to this assignment of error.

ADMISSIBILITY OF THE STATEMENT
Swanier next complains that his statement was improperly admitted for several reasons. Each of these is discussed individually below.

A.
First, Swanier argues that he was effectively arrested at 2:44 a.m. when Officer Newnum asked him to wait to speak to Investigator Dubuisson. He argues that because he was not formally advised that he was under arrest until he had given the full confession, his confession was illegally obtained. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court stated: "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person." No formal declaration of arrest is required for the subject to be considered under arrest. Smith v. State, 229 So.2d 551 (Miss. 1969); Reed v. State, 199 So.2d 803 (Miss. 1967).
Was Swanier seized? This is the subject of factual dispute. Officer Newnum testified that during the interview Swanier asked if he was under arrest and Dubuisson told him no, he was free to go. Investigator Dubuisson testified to the same thing. Investigator Winnegar testified that once during the interview Swanier asked if he was under arrest and he was told no. Swanier himself testified that Dubuisson told him he was not under arrest but that he was not free to go. Swanier stated that he was guarded when he went to the bathroom and not permitted to roam about the station house.
If Swanier was told that he was free to go, he was not under arrest; however, if Swanier was told that he was not under arrest but was not free to go, then under the authority of Terry v. Ohio and Reed v. State, he clearly was under arrest. That being a factual question the decision was for the trial court.
If Swanier was under arrest, was there probable cause for the arrest? In Smith v. State, 386 So.2d 1117 (Miss. 1980), this Court stated:
The existence of "probable cause" or "reasonable grounds" justifying an arrest without a warrant is determined by factual and practical considerations of everday life on which reasonable and prudent men, not legal technicans act. The determination depends upon the particular evidence and circumstances of the individual case. The facts necessary to uphold an arrest without a warrant must be sufficiently strong to support the issuance of a warrant for arrest.
Smith, at 1119.
The facts leading to Swanier's apprehension are that it was known that a marked $2.00 bill was stolen during the murder-robbery. That $2.00 bill was passed three days later to the clerk in the same store in which the robbery had taken place. Swanier matched the description of the man who passed the bill. Swanier admitted having passed the bill prior to being asked to go with Investigator Dubuisson to the police station. Once at the police station, Swanier gave inconsistent stories as to how he had obtained the $2.00 bill. We are of the opinion that there was probable cause to arrest Swanier.

B.
Here, Swanier argues that he did not give a knowing and intelligent waiver of his rights as he was not informed of the crime the police were investigating. Quite simply, the testimony at the suppression hearing by Swanier himself does not support *187 this assertion. Swanier testified that Dubuisson told him he wanted to speak to him about a murder case. This was before even asking Swanier to accompany him to the police station. Swanier testified that after they got to the station he knew what he was being questioned about. There is no merit to this argument.

C.
Even if Swanier was illegally seized, his statement may be admissible under Hall v. State, 427 So.2d 957 (Miss. 1983). In Hall, this Court quoted from Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), in setting forth factors which are to be considered when the legality of an arrest is used to challenge the admissibility of a statement. Those factors are:
(1) The temporal proximity of the arrest and the confession;
(2) The presence of intervening circumstances;
(3) The purpose and flagrancy of the official misconduct, i.e., the making of the illegal arrest; and
(4) Any other circumstances that seem relevant.
Under the factors set forth in Brown and Hall, we are of the opinion that Swanier's statement, had it been the result of an illegal arrest, was nonetheless admissible. Although there was some period of 60 hours between the arrest and confession in Hall and only 2 1/2 hours here, the intervening circumstances (free and private discussion with his grandfather and a priest), and the non-existence of any flagrant violation by the police (Swanier's rights were read to him and he was treated civilly and politely without threat or duress) indicate that his statement was voluntarily given.

D.
Next, Swanier argues that his statements were obtained as the result of an inducement or reward. Of course, the United States Supreme Court has repeatedly held that a statement or confession which is obtained by a promise of leniency or immunity, is inadmissible. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). This Court has also adhered to that rule. Sanders v. State, 435 So.2d 1177 (Miss. 1983); Miller v. State, 250 So.2d 624 (Miss. 1971); Agee v. State, 185 So.2d 671 (Miss. 1966).
What Swanier argues was an inducement to him was a statement by his grandfather that "we'd help him as much as we could." Captain Alexander testified that when Swanier started crying after his father came into the room, he only calmed down when Alexander told him "We'd help him as much as we could." This was before Swanier gave his inculpatory statement to Investigator Dubuisson; however, it was after Swanier had already confessed to his grandfather in private. We are of the opinion that Captain Alexander's statement that the family would help Swanier as much as possible did not render his confession involuntary and therefore inadmissible. That comment was certainly not an inducement to Swanier to confess, as Swanier had already made an inculpatory statement to his grandfather. We see no merit to this argument.

E.
Finally, Swanier contends that his statement was inadmissible because he could not knowingly and intelligently waive his rights because he was drunk and under the influence of drugs. Although Swanier testified to having consumed large amounts of alcohol and drugs prior to making the statement, that was a matter of factual dispute. Officer Newnum, Investigator Dubuisson and Officer Winnegar stated that Swanier was coherent and alert. They stated that he did not look drunk and did not fall asleep during questioning. They did not notice alcohol on his breath. Even Swanier's grandfather testified that he believed Swanier understood Dubuisson's questions and knew what he was talking about. This being a question of *188 fact and the trial court being the fact finder at the suppression hearing, we are of the opinion that there was more than ample evidence to support the trial court's decision that the waiver of rights was both knowing and intelligent. There is no merit to this argument.

THE MANSLAUGHTER INSTRUCTION
Here, Swanier argues that he was improperly denied Instruction D-12 which provided an alternative verdict of manslaughter. This issue was discussed in Farr v. State, 199 Miss. 637, 25 So.2d 186 (1946) where this Court held that where the evidence does not warrant a manslaughter instruction, one should not be given. In other cases this Court has held that where an instruction is not warranted by the evidence it should not be given. Nobles v. State, 464 So.2d 1151 (Miss. 1985); Colburn v. State, 431 So.2d 1111 (Miss. 1983).
In the instant case there was no evidence which would support the giving of a manslaughter instruction. The state's evidence showed a robbery and repeated stab wounds to the victim. The victim was forced to remove cash both from a cash register and a floor safe. His jugular vein was slashed and he was also stabbed in the back. Under the defendant's version of the events, he had nothing to do with the stabbing of the victim. Therefore, there was no evidence warranting a manslaughter instruction.

INSTRUCTION S-1
Swanier argues that the court erred in giving Instruction S-1 because it required the jury to find him guilty if they believed beyond a reasonable doubt that he "did unlawfully, willfully and feloniously and of his malice aforethought kill and murder" the victim in the commission of a crime or felony or armed robbery. Swanier argues that the phrase "and of his malice aforethought" was not required under the statute and therefore the instruction was improper. The state confesses that the language was surplus; however, they argue, as the trial court pointed out, that that phrase serves only to raise the state's burden of proof and could in no way have prejudiced Swanier. Swanier has failed to show how the surplus language prejudiced him whatsoever, and, in the opinion of this Court, it could not have.
Based on all of the foregoing, we conclude that Swanier's conviction of capital murder and sentence of life imprisonment should be affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., not participating.