411 So.2d 90 (1982)
Butler MOSS
v.
STATE of Mississippi.
No. 53310.
Supreme Court of Mississippi.
March 17, 1982.
*91 Jackson M. Brown, Starkville, for appellant.
Bill Allain, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
Before SUGG, P.J., and WALKER and HAWKINS, JJ.
SUGG, Presiding Justice, for the Court:
Appellant was convicted of possession of a controlled substance with intent to deliver, sentenced by the Circuit Court of Clay County to serve a term of seven years in the Mississippi Department of Corrections, and fined $5,000. The sole assignment of error is that the trial court erred in overruling appellant's motion to suppress the evidence seized in the dwelling house of Daniel Cox.
The motion to suppress was heard separately before the trial. The state introduced the following witnesses on the motion to suppress: Robert Alexander, Jerry Gardner and Tommie R. Peterson, Agents for the Mississippi Bureau of Narcotics.
Alexander and several agents for the Mississippi Bureau of Narcotics met with Captain Wallace, another agent, on August 21, 1980. Captain Wallace had received information from Alfred Guyton and Robert Walker, following their arrest on the night of August 20 by two highway patrolmen, that they were enroute to Starkville to purchase approximately 20 pounds of marihuana. Guyton and Walker had a sheet of paper containing directions from Arkansas to Starkville, Mississippi, along with two telephone numbers to call upon arrival, with the notation "Kevin" on the sheet. Guyton and Walker agreed to assist in apprehending the persons from whom they were going to purchase marihuana.
Two connecting rooms were rented at a Starkville motel and a number of officers were disbursed throughout the interior of the motel and in the area outside the motel. A transmitter was concealed in Guyton and Walker's motel room for the purpose of permitting officers to monitor any conversations in the room. At about 3:05 a.m. on the 21st, Walker called Kevin Stewart and was instructed to call back at about 6:00 a.m. Another call was made to Stewart who advised Walker that he would contact him later. Stewart came to the motel later in the morning and identified his supplier as "Heavy" who worked at a service station at the Crossroads. "Heavy" was personally known to Agent Alexander as Butler Moss, the appellant. Alexander also knew that Moss worked at a service station at the Crossroads, also known as Mayhew Junction. Stewart left the motel, returned later in the morning, and stated that he would remain there until he received a phone call from his supplier. About 1:30 p.m. a phone call was received at the room, Stewart answered the phone, and after a short conversation, stated that he had talked to his supplier and they were to proceed to a location in rural Oktibbeha County to exchange the "dope."
Stewart, along with Walker and Guyton, left the motel in a vehicle and were followed by five Mississippi Bureau of Narcotics officers and the Sheriff of Oktibbeha County. Before Walker and Guyton left the motel they were equipped with a body bug so their conversation with others could be monitored by the officers. They were instructed to inquire about the availability of cocaine after they saw the marihuana that they were going to purchase. This was a code to alert the officers that the purchase of the marihuana was about to take place. Captain Wallace took up a position where he could observe the service station at the Crossroads and informed the other agents by radio that appellant had entered the automobile of Walker and Guyton.
The automobile with Moss and Stewart as passengers, then proceeded north on Highway 45 which led from Oktibbeha County into Clay County. The officers followed the automobile through West Point into a rural area of Clay County to the home of *92 Daniel Cox. The officers did not know at that time that Daniel Cox owned the house. The officers remained approximately 300 yards from the house, which was within range of the transmitter. About one and one-half minutes after Walker, Guyton, Stewart and appellant entered the Cox home they heard Walker and Guyton inquire if any cocaine was available. The inquiry was repeated two or three times. This inquiry alerted the officers that Walker and Guyton had seen marihuana and a sale was about to take place.
The officers then surrounded the house, Agent Peterson knocked and announced, "Police." Upon hearing scuffling sounds inside, Peterson entered the residence. Officers McVey, Wallace and Alexander along with two Mississippi State Highway Patrolmen, entered the kitchen and saw four or five bags containing a green vegetable matter, which appeared to be marihuana, on the kitchen table. Appellant, Cox, Stewart, Walker and Guyton were in the kitchen. The officers informed them that they were under arrest, handcuffed the five, secured the residence, and sent Agent McVey to get a search warrant for the residence.
The officers explained that they handcuffed their two informants, Walker and Guyton, along with the others to conceal the fact that they were working with the officers. After handcuffing the five individuals in the kitchen, the officers searched the other rooms in the house to see if any other persons were in the house. They did not open any drawers, but looked in places that people might be able to hide. In the northwest corner bedroom they saw a footlocker at the foot of the bed. In plain view on the footlocker there was a plastic bag containing a quantity of a green substance which appeared to be marihuana.
After McVey had been dispatched to get a search warrant, Cox, the owner of the house, asked Agent Peterson why they were all "just standing around," and Cox was informed that the officers were awaiting the return of Agent McVey with a search warrant before they proceeded to search the residence. Cox then stated that the officers did not need a search warrant and they could search as much as they wanted to. Cox executed a consent to search at that time. After receiving permission from Cox to search the house, the officers found seven or eight pounds of marihuana inside the footlocker previously referred to.
Alexander explained that they went into the house upon hearing the code message for three reasons. The first reason was that they were concerned about the safety of the informants who were to purchase a total of 20 pounds of marihuana and the informants lacked approximately $5,000 having enough money to purchase the 20 pounds of marihuana. The second reason was that the officers were concerned about the possible destruction of evidence, and the third reason was that they had no knowledge of where the sale was to take place so they were unable to obtain a search warrant before entering the house and securing it. It was also developed that Captain Wallace was not able to testify because he was recovering from a heart attack and was in a hospital for a cardiac catherization.
The only witness who testified for the defendant on the motion to suppress was Kevin Stewart who testified that the officer was in the house when he called "police." He heard the word cocaine mentioned by one of the informants.
The question presented by appellant's assignment of error is, did the seizure of the marihuana observed in plain view in the wake of a warrantless and nonconsensual entry of the dwelling house of Daniel Cox violate appellant's Fourth Amendment rights?
Appellant relies on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) in support of his argument that the marihuana observed in plain view by the arresting officers and seized by them should have been suppressed because the entry into the private residence of Daniel Cox was warrantless and nonconsensual. In Payton, and the consolidated case of Riddick v. New York, the United States Supreme Court specifically held:

*93 [T]hat the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 16 Ohio Ops 2d 384, 86 Ohio L Abs 513, 84 ALR2d 933; Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. (445 U.S. at 576, 100 S.Ct. at 1374, 63 L.Ed.2d at 644)
The facts in Payton and Riddick were stated in the opinion as follows:
On January 14, 1970, after two days of intensive investigation, New York detectives had assembled evidence sufficient to establish probable cause to believe that Theodore Payton had murdered the manager of a gas station two days earlier. At about 7:30 a.m. on January 15, six officers went to Payton's apartment in the Bronx, intending to arrest him. They had not obtained a warrant. Although light and music emanated from the apartment, there was no response to their knock on the metal door. They summoned emergency assistance and, about 30 minutes later, used crowbars to break open the door and enter the apartment. No one was there. In plain view, however, was a .30-caliber shell casing that was seized and later admitted into evidence at Payton's murder trial.
In due course Payton surrendered to the police, was indicted for murder, and moved to suppress the evidence taken from his apartment. The trial judge held that the warrantless and forcible entry was authorized by the New York Code of Criminal Procedure, and that the evidence in plain view was properly seized. He found that exigent circumstances justified the officers' failure to announce their purpose before entering the apartment as required by the statute. He had no occasion, however, to decide whether those circumstances also would have justified the failure to obtain a warrant, because he concluded that the warrantless entry was adequately supported by the statute without regard to the circumstances. The Appellate Division, First Department, summarily affirmed.
On March 14, 1974, Obie Riddick was arrested for the commission of two armed robberies that had occurred in 1971. He had been identified by the victims in June 1973, and in January 1974 the police had learned his address. They did not obtain a warrant for his arrest. At about noon on March 14, a detective, accompanied by three other officers, knocked on the door of the Queens house where Riddick was living. When his young son opened the door, they could see Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest. Before permitting him to dress, they opened a chest of drawers two feet from the bed in search of weapons and found narcotics and related paraphernalia. Riddick was subsequently indicted on narcotics charges. At a suppression hearing, the trial judge held that the warrantless entry into his home was authorized by the revised New York statute, and that the search of the immediate area was reasonable under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The Appellate Division, Second Department, affirmed the denial of the suppression motion. (445 U.S. at 576, 577, 578, 579, 100 S.Ct. at 1375, 1376, 63 L.Ed.2d 645, 646)
In reversing both convictions the Supreme Court held that warrantless, nonconsensual entry into a home for the purpose of making a routine felony arrest is a violation of the Fourth Amendment in the absence of exigent circumstances justifying such entry. The Court stated:
But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly *94 defined than when bounded by the unambiguous physical dimensions of an individual's home  a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 97 A.L.R.2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. (445 U.S. at 589, 590, 100 S.Ct. at 1381, 1382, 63 L.Ed.2d at 652, 653)
The Court noted that a majority of the states permit warrantless entry into the home to arrest in the absence of exigent circumstances. In summarizing the position of the states, the Court stated:
At this time, 24 States permit such warrantless entries; 15 States clearly prohibit them, though 3 States do so on federal constitutional grounds alone; and 11 States have apparently taken no position on the question. (445 U.S. at 598, 599, 100 S.Ct. at 1386, 63 L.Ed.2d 658)
Mississippi is one of the 24 states permitting such warrantless entry under the authority of Mississippi Code Annotated, section 99-3-11 (1972).
It is clear to us, however, that the facts in this case do not fall within the prohibited pale of Payton for three reasons: First, the warrantless entry into the Cox residence was made under exigent circumstances. Second, a felony was being committed in the presence of the officers. Third, the house belonged to Daniel Cox and not appellant. Consequently, we are of the opinion that appellant, a visitor in Cox's home at the time of the entry, did not have standing to complain.

I
In Payton the Court did not consider whether exigent circumstances justified a warrantless entry into the home of Payton. The Court stated:
Before addressing the narrow question presented by these appeals, we put to one side other related problems that are not presented today. Although it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification. The Court of Appeals majority treated both Payton's and Riddick's cases as involving routine arrests in which there was ample time to obtain a warrant, and we will do the same. Accordingly, we have no occasion to consider the sort of emergency or dangerous situation, described in our cases as "exigent circumstances," that would justify a warrantless entry into a home for the purpose of either arrest or search. (445 U.S. at 582, 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 648, 649)
It was uncontradicted that none of the officers engaged in following the vehicle in which appellant was riding knew where appellant and the other occupants of the automobile were going. Shortly after arriving at a point near the Cox residence, the officers heard the code message. After hearing the code message, the officers then knew that marihuana was present and a sale was about to take place. Officer Peterson, after knocking and announcing his presence and identity, heard a scuffling noise inside the house. A reasonable officer could only conclude that those inside the house, who were then engaged in a criminal activity, had been made aware of his presence and was justified in the belief that the evidence might be destroyed. The proof showed that there were several commodes inside the house and the marihuana could have been flushed down a commode, thus necessitating immediate entry of the house to prevent the destruction of the evidence. In our opinion the evidence shows that exigent *95 circumstances existed which justified a warrantless entry into Cox's home.

II
Under section 99-3-7 Mississippi Code Annotated (1972) an officer is authorized to arrest a person without a warrant committing a felony in his presence.
An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. And in all cases of arrests without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit.
An offense is being committed in the presence of an officer when he acquires knowledge thereof through one of his senses. Where through the sense of sight, or smell, or hearing, an officer receives knowledge that an offense is being committed in his presence, he may arrest the offender without a warrant. Reed v. State, 199 So.2d 803 (Miss. 1967). The officers had been monitoring the conversation taking place inside the house and were aware that marihuana was inside the house and that a sale was in progress. Clearly a felony was being committed in the presence of officers who were monitoring the conversation and Peterson had a right to enter the premises after knocking and announcing his identity.
Police officers may intercept a crime in progress and arrest the persons involved in the commission of the crime without obtaining a warrant for the arrest of the participants in the crime.

III
The undisputed testimony shows that the house entered by the officers did not belong to appellant but belonged to Daniel Cox. This fact is significant because the Payton court, before addressing the narrow question there presented, identified preliminarily several related problems that were not at issue. One of the problems was stated as follows:
Nor do these cases raise any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect. The police broke into Payton's apartment intending to arrest Payton, and they arrested Riddick in his own dwelling. (445 U.S. at 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 649)
Appellant was a visitor in the Cox home at the time the officers entered the home and relies on the automatic standing rule announced in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) which has been followed in a number of cases decided by this Court. The automatic standing rule announced in Jones was overruled in United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In Salvucci, the Court held:
We are convinced that the automatic standing rule of Jones has outlived its usefulness in this Court's Fourth Amendment jurisprudence. The doctrine now serves only to afford a windfall to defendants whose Fourth Amendment rights have not been violated. We are unwilling to tolerate the exclusion of probative evidence under such circumstances since we adhere to the view of Alderman [Alderman v. U.S., 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176] that the values of the Fourth Amendment are preserved by a rule which limits the availability of the exclusionary rule to defendants who have been subjected to a violation of their Fourth Amendment rights. (448 U.S. at 95, 100 S.Ct. at 2554, 65 L.Ed.2d at 630)
The relevant inquiry in the light of Salvucci and subsequent decisions is whether the police infringed upon some legitimate *96 expectation of privacy the defendant had. Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). See also: Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
Appellant did not testify at either the suppression hearing or at the trial. He did not produce any evidence to show that he had a legitimate expectation of privacy while he was in the home of Daniel Cox; therefore, he had no standing to complain about the warrantless entry into Cox's home and the seizure of contraband therein.
We recognize that Salvucci, Rawlings and Rakas all were cases dealing with Fourth Amendment rights under searches and seizures; however, we are of the opinion that the rationale of these cases applies to the arrest of an accused in the home of another, when the accused claims his arrest violates his reasonable expectation of privacy guaranteed by the Fourth Amendment.
The residence of Cox was not appellant's castle, and although he was legitimately on the premises presumably with the permission of the owner, he had no legitimate expectation of privacy and was not entitled to challenge the fruits of the subsequent seizure since none of his rights were violated.
We therefore affirm.
AFFIRMED.
PATTERSON, C.J., SMITH, P.J., and WALKER, BROOM, ROY NOBLE, LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.