KITCHENS, Justice,
dissenting:
¶ 113. The right to a fair trial is firmly entrenched in both, the United States and Mississippi Constitutions. U.S. Const, amend. VI; Miss. Const, art, 3, § 26. This right is inviolate, It is not contingent upon the severity of the crime, the personal character of the criminal defendant, or a court’s desire for efficiency. Thé record in this' case teems with significant encroachments upon Crawford’s constitutional rights. I respectfully dissent.
¶ 114. I join Presiding Justice Dickinson’s dissent, agreeing with him that the jury instruction regarding insanity improperly shifted the burden to Crawford to prove his own insanity. I write separately because most of the physical evidence in this case was obtained as a result of an illegal search and because, given the serious errors in this- case and the inordinate amount of time that passed between' Crawford’s trial and this appeal, the trial court should hold a hearing on the' issue of Crawford’s right to á speedy appeal.
I. ILLEGAL SEARCH
¶ 115. The majority of the physical evidence was seized by peace officers through an illegal search, in violation of the Fourth Amendment to the United States Constitution and Article 3, Section 23, of the Mississippi Constitution. Because the majority omits major, relevant facts related to the search,T shall recount them.
¶ 116. On April 13,1991, Tippah County Deputy Sheriffs Greg Hopper and Tommy Story received a telephone call to the effect that a girl needed medical attention because she had been hit in the head. The girl was Nicole, Sue’s[19] friend. Nicole told the deputies that Sue was with Crawford at his house. Deputy Hopper and Chief Deputy Story went to Crawford’s residence. Chief Deputy. Story "provided the following testimony concerning the search:
Q: What’ did you do when you got to the residence of Chuck Crawford?
A: All right, we went to the door, of the house. We knocked and shouted for Chuck and her. Nobody answered. At that time[,] his relatives came up and said, “Go on in and look for them;” and we went in the house.
[[Image here]]
Q: Did you find Chuck Crawford or [Sue] there at the residence?
A: No, we didn’t. .
*931 Q: After you searched through the residence, what did you do next?
A: Once we went in and searched the residence, we exited at the back,-went down the back steps....
¶ 117. Deputy Hopper testified about the search as follows:
Q: 'What did you do when you got to the white house, and who else was there when you got there? ■ ' ■
A. As we first got there, there was no one else there. We didn’t establish that there wasn’t anyone in the residence until we entered the residence and made a pass through the residence to check for [Sue].
Q. After you made the pass through the residence searching for [Sue], what did you next do, immediately next do at that point?
A. Well, we got to the back door; and the back door was open. As we went through the back door, we. noticed what appeared to be blood drippings on the steps as you go down into the yard and starting trying to locate [Sue] or their whereabouts. As we started across the yard at the southeast corner of the house, we noticed duct tape, apparent duct tape with what appeared to be hair, hair samples on it. As we went across the garden, there was — it had been raining... It was not raining at that time, and there was footprints that went across the garden and we searched the old abandoned house, and then we could tell where there had been a vehicle that had torn out very suddenly.
Q. Like a skidmark or spin out mark?
A. Yes, spin marks on the east side of the old abandoned house.
•Q. What did y’all then do at that time?
A. At that time myself and Mr. Story were the two that crossed the garden and went to the old house. We went back and at that time Mr. Dewey Crawford, which is .Charles Ray Crawford’s grandfather talked to Mr. Story and give him the information on the truck and what'type vehicle he would be driving; and at that time Mr. Story stayed on the radio while I went back into the residence and started collecting evidence. ' ,
Q. . When you went back into the residence, what items, what physical items did you take into evidence from out of the residence?
[[Image here]]
A. The first piece of evidence that was taken was what appeared to be a tampon.
[[Image here]]
A. We had a roll of duct tape that had apparent hair fibers, on it.
Q. And- where did you find the duct tape?
A: The duct tape was in the kitchen laying on the kitchen table.
[[Image here]]
A: We also recovered strippings of duct tape that was on the kitchen table.
[[Image here]]
A. After getting the duct tape from the house, we then took the ... quilt or blanket that was covered over the bed —
¶ 118. During cross-examination, Deputy Hopper agreed that he did not find any evidence of Sue and Crawford’s “being there at 'the time or any evidence of any crime being committed at the time.” He also testified that he assumed that the home he searched was Charles Crawford’s and that he received permission to search the home from Crawford’s grandfather, Dewey Crawford.
¶ 119. Crawford’s defense counsel twice objected to evidence gained- as a result of *932 the search of Crawford’s home. Specifically, trial counsel contended: “Your Honor, we’re going to object to him testifying about anything he found in that house unless it had been shown that he had permission to search or that he had a valid search warrant.”
¶ 120. In response, the State argued that the sheriffs deputies “never in essence, left the residence.” (Emphasis added.).
¶ 121. Tippah County sheriffs deputies first entered Crawford’s house under exigent circumstances in a legitimate effort to find Sue, who was in danger, and Crawford. They left the house, abandoned their search, and obtained permission from Crawford’s grandfather, from whom Crawford had rented the house for more than five years, to reenter the premises. They searched the house and seized a tampon, a roll of duct tape with hair fibers on it,[20] “strippings” of duct tape, and a blanket. These items were offered into evidence at trial by the State as proof of Crawford’s guilt.
¶ 122. The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. The Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or thirigs to be seized.
¶ 123. Article 3, Section 23, Of the Mississippi Constitution provides:
The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.
¶ 124. A search occurs within the meaning of those provisions when the government enters a place where the person challenging the search has a reasonable expectation of privacy. Baker v. State, 802 So.2d 77, 79 (Miss.2001) (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516-17, 19 L.Ed.2d 576 (1967)). To protect this right, courts must exclude evidence obtained through warrantless searches absent an applicable exception to the warrant requirement. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). No exception to the Mississippi Constitution’s and United States Constitution’s warrant requirements exists in this case.
¶ 125. As this Court explained in Moss v. State, 411 So.2d 90 (Miss.1982):
The Fourth Amendment protects the individual’s privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual’s' home — a zone that finds its roots in clear and specific con *933 stitutional terms: “The right of the people to be secure in their ... houses ... shall not be violated.” That language unequivocally establishes the proposition that “[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.”
Moss, 411 So.2d at 93-94 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682-683, 5 L.Ed.2d 734 (1961)).
¶ 126. “To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person’s house as unreasonable per se, one ‘jealously and carefully drawn’ exception, recognizes the validity of searches with the voluntary consent of an individual possessing authority.” Georgia v. Randolph, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (internal citations omitted). •
¶ 127. In Brown v. State, 358 So.2d 1004, 1005 (Miss.1978), this Court said:
Consent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy.
Brown, 358 So.2d at 1005 (emphasis added); see also United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Houston v. State, 531 So.2d 598, 602 (Miss.1988); Shaw v. State, 476 So.2d 22, 24 (Miss.1985); Haralson v. State, 318 So.2d 891 (Miss.1975). Thus, whether a third party can give valid consent to enter and search turns upon his or her apparent authority over a property. The United States Supreme Court noted the following standard: “[Determination of consent to enter must ‘be-judged* against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?” Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)).
¶ 128. On multiple occasions, the United States Supreme Court has held that third parties, not having any apparent authority and possession of the property, cannot provide sufficient consent for searches. For example, in Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), the Court held that a landlord could not consent to a search of a tenant’s property. Moreover, in Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Court found that a hotel manager could not provide police valid consent to search an occupied hotel room.
¶ 129. This Court has held that Article 3, Section 23, of the Mississippi Constitution is similarly intolerant of third parties with no apparent authority who undertake to give consent for searches. In Martin v. State, 217 Miss. 506, 509, 510, 64 So.2d 629, 630 (1953), this Court held that consent from a man’s brother-in-law was insufficient to circumvent the Mississippi Constitution’s warrant requirement. Similarly, in May v. State, 199 So.2d 635 (Miss.1967), the Court held that a search was illegal when* an incarcerated man’s fifteen-year-old son unlocked the man’s house’s front door for the purpose of permitting officers to enter and search the home.
¶ 130. Clearly, the consent exception to the Fourth Amendment’s and Section 23’s warrant requirements were not met. The deputy sheriffs testified that they believed the home was occupied only by' Charles Crawford. The officers testified-that they thought that the property was .“in the ex- *934 elusive control or possession of the defendant.” Brown, 358 So.2d at 1005. It therefore is obvious that the sheriffs deputies could not receive valid consent to search Crawford’s house from anyone other than Crawford. The record is-devoid of proof that the sheriffs deputies had any reasonable basis to believe that the grandfather possessed any authority whatsoever to consent to the officers’ second entry into Crawford’s residence.
¶ 131. The exigent circumstances doctrine provides another narrow exception to the Fourth Amendment’s protection against searches conducted without prior approval by a judge. The doctrine' recognizes that “warrantless entry by criminal law enforcement officials may be'‘legal when there is compelling need for official action and no time to secure a warrant.” Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (emphasis added). The doctrine has been applied where law enforcement agents fear imminent destruction of evidence, Ker v. California, 374 U.S. 23, 39-40, 83 S.Ct. 1623, 1633, 10 L.Ed.2d 726 (1963), escape of a suspect, or grave danger to their lives or the lives of others. Warden v. Hayden, 387 U.S. 294, 298-300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Because the doctrine is an exception to the ordinary Fourth Amendment warrant requirement, the government has the burden of showing that the warrantless entry fits within the exception. United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). Finally, in applying the.doctrine, an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen. Terry, 392 U.S. at 21-22, 88 S.Ct, 1868,
¶ 132. The first time the deputies- entered the house, the exigent circumstances doctrine applied. Based upon- the information Nicole had proyided to the sheriffs department, the deputies reasonably believed that Sue’s life and safety were in grave danger. The deputies entered the house in an effort to rescue Sue. But they quickly ascertained that she was not' there. The deputies then left the house to look outside and at-abandoned properties near Crawford’s home. During this investigation, the deputies found a tire mark where Crawford’s car recently had spun out as he left the area. At the time the deputies first had. entered Crawford’s home they had good reason to believe that Sue was inside.
¶ 133. But a warrantless search must be “strictly circumscribed by the exigencies which justify its initiation.” Terry v. Ohio, 392 U.S. 1, 25-26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When Deputy Hopper reentered the house for-the purpose of “bagging and tagging” evidence, a clear violation of the Fourth Amendment occurred. At that point, an exigency no longer existed with regard to Crawford’s home; the officers had abandoned the search of Crawford’s house in order to look elsewhere. The United States Supreme Court has limited the exigency exception to circumstances in which' there is “no time to secure á warrant.” Tyler, 436 U.S. at 509, 98 S.Ct. 1942. The evidence inside was riot the type of evidence that would dissipate rapidly and there was no danger of its imminent destruction. See Mincey v. Arizona, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (“[TJhere were no exigent circumstances in this case.... There was no indication that evidence would be lost, destroyed, or removed. during the time required to obtain a search warrant_And there is no suggestion -that a search warrant could ’not easily and- conveniently have been obtained.”); - If one of the deputies had left the -house to obtain a warrant and the other deputy had remained on the scene, the evidence would have been in the exact *935 same condition when he returned' with a search warrant. Strange v. State, 530 So.2d 1386, 1340 (Miss.1988) (“No exigent circumstances existed, as, again, three of the officers could have secured the premises while a fourth complied with the Constitution and obtained a warrant.”) (citations omitted). Further, “[i]t is perfectly proper for law enforcement officials to secure an area to protect potential evidence while a warrant is being procured.” Carney v. State, 525 So.2d 776, 787 (Miss.1988). Hopper testified that the officers- reentered the house because they did not want to wait two to three hours for a magistrate to sign a warrant. He testified that “we needed to get the evidence so we could get back out and look for Mr. Crawford_” .
¶ 134. But the United States Supreme Court has expressly rejected an efficiency exception to the warrant requirement:
[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of . the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person’s home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law. For this reason, warrants are generally required to search a person’s home or his person unless “the exigencies of the situation” make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.
Mincey, 437 U.S. at 394, 98 S.Ct. 2408 (internal citations omitted).
¶ 135. The majority, relying on this Court’s precedent in Baker v. State, 802 So.2d 77, 79 (Miss.2001); Taylor v. State, 733 So.2d 251 (Miss.1999); and Smith v. State, 419 So.2d 563, 570 (Miss.1982), finds that there was no Fourth Amendment violation because “the second entry into Crawford’s residence constituted a continuation of the original search.” But the United States Supreme Court never has allowed police to extend -their entry into a dwelling based on the exigency exception to reenter a dwelling for the purpose of conducting a plain-view search, .as happened in this case. . In fact, in Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Supreme. Court rejected the idea that exigent circumstances gave police officers carte blanche authority to continue searching a suspect’s dwelling indefinitely. Id. at 393, 98 S.Ct. 2408. Thus, although the United States Supreme Court has held that “the police may seize any evidence that is in plain view during the course of their legitimate emergency activities,” id. (emphasis added), it also has held that a warrantless search must be “strictly circumscribed by the exigencies which justify its initiation,” Terry, 392 U.S. at 25-26, 88 S.Ct. 1868, and’ that the exigency exception is limited to circumstances in which there is “no time to secure a-warrant.” Tyler, 436 U.S. at 509, 98 S.Ct. 1942.
¶ 136. Moreover, the majority’s reliance on the “plain-view” doctrine is inconsistent with the United States Supreme Court’s precedent. The United States Supreme Court has held that:
[T]he discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search ‘into a “general” one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of *936 the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrant-less searches as “per se unreasonable” in the absence of “exigent circumstances.”
Coolidge v. New Hampshire, 403 U.S. 443, 469-70, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (emphasis added) (internal citations omitted). Thus, based on the logical premises of the plain-view doctrine which require discovery to be “inadvertent,” the majority errs in allowing the sheriffs deputies to reenter Crawford’s house for the purpose of conducting a “plain-view” search.
¶ 137. It is clear that the majority, in holding that it is permissible for police officers to reenter a premises after an exigency has ceased for the purpose of performing a “plain-view” search, deviates from the United States Supreme Court’s interpretation of the Fourth Amendment and decreases the protection that Mississippi citizens enjoy under the Fourth Amendment to the United States Constitution. As a state Supreme Court, this Court is compelled by the Supremacy Clause to adhere to the United States Supreme Court’s interpretation of the Fourth Amendment by not attempting to establish a lower standard of rights in Mississippi. U.S. Const, art. VI, cl. 2 (“This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”). In some instances, depending on the provision, the United States Supreme Court’s interpretation of a constitutional right or standard can be considered as a floor, and our interpretation of a similar right under the Mississippi Constitution can create a ceiling, so long as it- does not pose a conflict.' See California Federal Savings & Loan Ass’n. v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (holding that a a state’s pregnancy discrimination law can go beyond the requirements of the federal Title VII); Downey v. State, 144 So.3d 146, 151 (Miss.2014) (“[Supreme Court precedent] does not require Mississippi to follow the minimum standard that the federal government has set for itself. We • are empowered by our state constitution to exceed federal minimum standards of constitutionality.”). However, we are not allowed to abrogate or diminish clearly-articulated federal rights, as the majority does here.
¶ 138. Ultimately, Crawford’s grandfather did not have apparent authority over the property whereby he could consent to the search and, after the officers had determined that Sue was no longer in the home, they returned for the express purpose of collecting evidence to incriminate Crawford. This was a clear violation of Crawford’s Fourth Amendment rights. The fruits of the search, a tampon, a roll of duct tape, “strippings” of duct tape, and a blanket, should have been excluded from evidence at Crawford’s criminal trial.
II. SPEEDY APPEAL
¶ 139. Twenty-one years have passed since the jury returned a guilty verdict in this case, and we just now are reviewing this case on appeal. This amounts to a gross failure of our justice system and offends our time-honored traditions of justice and fair play.
¶ 140. When a state statutorily guarantees the right to a direct appeal of a *937 criminal conviction, as Mississippi has, Mississippi Code Annotated Section 99-35-101 (Supp.2014), the state must make that appeal satisfy the Due Process Clause. Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). In Lanier v. State, this Court recognized that excessive delay in the appellate process may rise to the level of a due-process violation. Lanier v. State, 684 So.2d 93, 97-100 (Miss.1996).
¶ 141. The majority is correct in its assertion that, based on our decisions, relief for a speedy appeal violation is available only when this Court finds that there is reversible error on other grounds. In other words, “where no other reversible error exists, then the reversal on the grounds of a denial of a speedy appeal is inappropriate.” Lanier, 684 So.2d at 100 (internal citations omitted). Even so, it is apparent that there have been multiple reversible errors committed in this case, including admission of the unlawfully obtained fruits of the search of Crawford’s residence. As such, it is appropriate to consider the merits of Crawford’s speedy appeal claim.
¶ 142. This Court analyzes speedy appeal claims through a modified version of the speedy trial balancing test articulated by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Lanier, 684 So.2d at 98 (citing Rheuark v. Shaw, 628 F.2d 297, 303 n. 8 (5th Cir.1980)). The first three factors of this test are: the length of the delay, the reason for the delay, and the defendant’s assertion' of his right. Id. The final factor, prejudice, considers:
(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person’s grounds fot appeal, and his or her defenses in case of reversal and retrial, might be impaired.
Lanier, 684 So.2d at 98 (quoting Rheuark, 628 F.2d at 303 n. 8).
A Length 'of the Delay
¶ 143. In Lanier, this Court found that a nine-year, eight-month delay from the filing of a notice of appeal to the completion of briefing raised speedy appeal concerns. Id. at 98. In Henry v. State, this Court characterized a four-year-long delay between the final judgment and the record’s being filed with this Court as “a matter profoundly more disturbing than the errors alleged above.” Henry v. State, 486 So.2d 1209, 1214 (Miss.1986). The circuit judge imposed Crawford’s sentence August 6, 1993. More than twenty years have elapsed since that time. Crawford’s first notice of appeal was filed November 9, 1998. More than sixteen years have passed since then.
■ B, Reason for the Delay
¶'144. The record fails to disclose why Crawford’s appeal has taken so long to reach this Court. The trial court, over the years, has appointed multiple attorneys to file an appeal on Crawford’s behalf.
¶ 145; First, Crawford’s trial counsel, James Pannell, never filed any post-trial motions or a notice of appeal. He also never withdrew as Crawford’s counsel.
¶ 146. Two years later, after Crawford sent multiple pro se letters inquiring about the status of his appeal, the circuit court, in turn, appointed David Bell to represent him. Bell requested' the trial transcript,’ moved for a judgment notwithstanding the verdict or for a new trial, filed a notice of appeal, and designated the record. After Crawford was granted leave to proceed in forma pauperis on November 30, 1998, *938 Bell too disappeared from this record-completely.
¶ 147. Then, after the circuit court’ had appointed Thomas Levidiotis as Crawford’s attorney in an unrelated capital-murder prosecution and this appeal, on March 21, 2000, Levidiotis sent a letter to the clerk of the Mississippi Supreme Court reqúésting any appearance forms that had been entered in this appeal. After this request, Levidiotis' disappeared from' the record. No progress occurred in the filing of Crawford’s appeal until ’ his present counsel began representing him in 2013.
, C. Assertion of Right
¶ 148. After the initial delay, Crawford began sending letters to check on; this case’s status in 1995. He also filed, a pro se motion for counsel in December, of 2013..

D. Prejudice ,

¶ 149. Lanier articulates that the primary concern regarding prejudice is whether Crawford’s defense will be impaired on remand. Lanier, .684 So.2d at 98. The record is silent on this matter. At best, this Court can only speculate about the evidentiary problems caused by a twenty-one-year-long delay.
¶ 150. In Lanier, understanding that the record was not entirely clear, on the matter of prejudice, this Court ordered that “since this Court has found other reversible error, Lanier shall be allowed to raise the issue that his ability to defend himself has been prejudiced and that the State deliberately engaged in oppressive conduct.” Id. at 100.
¶ 151. Thus, the length in delay of the appeal itself does not create reversible error. But because I would- remand this case to the trial court on other grounds, I also would direct the trial court to hold a hearing to address the reason for the delay in Crawford’s appeal and whether his defense has beens prejudiced.
CONCLUSION
¶ 152. I agree with Justice Dickinson that the insanity instruction in this case constitutes reversible error. I also believe that the majority of the physical evidence in this case was obtained through an illegal search of Crawford’s house and that, on remand, the twenty-óne-year delay in hearing this appeal likely created a bar to retrying Crawford for this crime. I respectfully dissent.
KING, J., JOINS THIS OPINION. DICKINSON, P.J., JOINS THIS ., OPINION IN PART.

.Sue is a pseudonym adopted to protect the identity of the underage rape victim.

. The State sent the roll of duct tape and the duct tape "strippings” to the Mississippi Crime Laboratory. A crime lab technician performed hair microanalysis on the hairs contained on both pieces of duct tape. She testified that she was able to "match” the hairs on the roll of duct tape to both Crawford and Sue and that she was able to "match” hairs on the "strippings” to Sue. The technician’s testimony was based on evidence seized by officers during an illegal search. It therefore should have been excluded from trial on this basis. See also Order, Manning v. State, No. 95-DP-00066 (Miss. May 10, 2013).